(Decided June 15th, 1860.)

THOMAS McCUBBIN, and wife, *vs.* EDWARD PATTERSON, and others.

A laborer was employed on condition that he would abstain from drink, and would allow his wife to draw his wages, to be used in support of himself, and wife and children. The wages were paid on this condition, every six months, a part having been drawn by the wife to support the family, and the *balance deposited in a savings bank*, in the name of the employer, *for the wife*. In the course of time, the balances so deposited, amounted, with interest, to a considerable sum, and constitute the fund in dispute. It does not appear that the husband directed or ever knew of the form in which the deposit was made. HELD:

That the condition and arrangement under which the wife was permitted to draw these wages, and the circumstance of the deposit, gave her no right to this fund as *her separate estate*, so that she could dispose of it by will or otherwise.

An agreement made in 1843, between husband and wife, stated, that they had separated, and that a certain fund was claimed by each, and to adjust this dispute it was agreed that the fund should remain as it stood, and that $75 per year should be paid therefrom to each of the parties during their joint lives, and $120 per year to the survivor during life, and upon the death of both, the balance of the fund then remaining should be paid to their children and their representatives equally, to be divided between them. The husband died in 1850, and the wife in 1853. HELD:

That this agreement was binding on the *husband*, if not on both, and the wife after his death, having received the sum specified therein up to her death, must be regarded in equity as having *waived* any right she may have had to any part of this fund, as widow, and to have adopted the agreement as between herself and the distributees of her husband, and as having agreed to be bound thereby; the fund, therefore, belongs to the children.

McCubbin & wife vs. Patterson, et al.

APPEAL from the Circuit Court for Baltimore City.

The appellee, Patterson, on the 7th of June 1857, filed his bill of interpleader, against the several defendants and claimants of a fund on deposit, subject to his order, in the Savings Bank of Baltimore, in which, after setting out all the circumstances of the origin of the fund, he prays to be protected against the conflicting claims pressed upon him, and that to that end he be allowed to pay the money into court, and the parties defendants being there decreed to interplead, that he be dismissed with his costs and charges; all of which was decreed as prayed, and the complainant Patterson was dismissed from the proceedings.

The bills set out that, in 1820, the complainant and Joseph W. Patterson, as the firm of J. W. & E. Patterson, were carrying on an iron rolling mill on the Gunpowder river, in Baltimore county, and that among the hands in their employ was one William Woollen, who, though a competent workman, they had determined, on account of intemperance, to discharge, but concluded to retain in their employ on a verbal arrangement between him and them, that instead of his wages, as they thereafter became due, being paid to him, (when they would be squandered,) they should remain in complainant's hands, to be held by him subject to the order of Providence Woollen, the wife of William, or be deposited by complainant in the Savings Bank of Baltimore, in complainant's name, for said Providence, "the intention of the parties to the arrangement being to create and preserve a fund for the maintenance of William, his wife and children, as well as to take from him the temptation to and means of intemperance." The bill states that this arrangement was acted on, and as William's wages became due they were paid to and retained by the complainant, to be applied as stated. That some years after this arrangement, Woollen and his wife ceased to live together, though no legal separation ever took place, and a dispute having arisen between them as to whom certain moneys, then in the hands of complainant, as also others deposited in the Savings Bank of Baltimore, belonged, an agreement of compromise was entered into, dated

the 23rd of May 1843, and which is filed with the bill, as Exhibit A. The bill then proceeds to state the material parts of this agreement or compromise, admitting its statement that, at its date, there was on deposit in said Savings Bank, in complainant's name, for the use of Priscilla or Providence Woollen, the sum of $2832.20, and also, in his hands, the further sum of $239.48, and alleges that both William and his wife acted upon this agreement during their joint lives, and that Mrs. Woollen, who survived him by a few years, continued to act upon it to the time of her death, and that all its requirements have been complied with, except that contained in the fourth clause, which the complainant is unable to carry out for the reasons stated, and which induced him to file this, his bill of interpleader. That William Woollen died in 1850, it is believed, without administration upon his estate, and his widow, Providence, died about July 1853. That after her death, her children by the marriage with Woollen, all of whom or whose representatives are parties to the bill, claimed the distribution of the fund among them under this agreement, but that in the period between the death of her husband and her own death, she had made two wills, by the latter of which, revoking all former wills, she bequeathed to Thomas McCubbin and wife all her estate, and these parties claim the fund by virtue of such bequest.

Agreement A, filed with the bill, is as follows:

"Articles of agreement made and concluded this 23rd day of May 1843, by and between William Woollen, of Baltimore county, of the one part, and Priscilla Woollen, his wife, of the other part. Whereas, a separation has taken place between the said parties; and whereas, there is deposited in the Savings Bank of Baltimore, in the name of Edward Patterson, for the said Priscilla Woollen, the sum of $2832.20, which fund is claimed by both of the parties to this agreement; and there is also in the hands of the said Edward Patterson, the sum of $239.48, which is also claimed by said parties; and whereas, they are anxious and willing to adjust all matters in dispute between them amicably, they have mutually agreed to the following terms, to wit:

"1st. That the deposit in the Savings Bank shall be continued in the name of Edward Patterson, as it at present stands.

"2nd. That from the moneys now in the hands of the said Edward Patterson, there shall be paid to each of the parties to this agreement, the sum of $75, on the day of the signing of this agreement, and the balance shall be deposited in the Savings Bank, in the name above mentioned.

"3d. There shall be paid to each of the said parties during the term of their natural life, annually on the first day of April in each and every year, the sum of $75, out of the moneys so as aforesaid deposited in the Savings Bank, and that upon the death of either party, there shall be paid annually to the survivor, the sum of $120, out of the moneys aforesaid.

"4th. Upon the death of both of the said parties, the balance of the said moneys then remaining in the Savings Bank, shall be paid over by the said Edward Patterson, to the children of the said William Woollen, and Priscilla, his wife, or to their representatives, equally to be divided between them.

"5th. That the said Edward Patterson is requested to give orders to each of the parties hereto in pursuance of this agreement, and as the mutual friend of both parties to carry this agreement into effect.

"6th. That in consequence of the death of Parker Everett, the son-in-law of the said parties, leaving a widow and four or five infant children, there shall be paid annually, to the said William Woolen, for the support of the said widow and children, the sum of $50.

*For Wm. Woollen,*

Edw'd Patterson.

*For Priscilla Woollen,*

William F. Giles."

The answers of the other parties, except McCubbin and wife, admit the allegations of the bill, and submit to a distribution of the fund under the fourth clause of Agreement A. McCubbin and wife, in their answer, deny the origin of the fund as stated in the bill, and assert that the greater portion

of it arose from the earnings and savings of Providence Woollen. They deny the validity of the supposed agreement or contract of the 23rd of May 1843, and aver that, even if that agreement was signed with the approbation of said Providence, which they do not admit, and acquiesced in by her during the life of William Woollen, it would not be binding upon her or her legal representatives, she being a *feme covert* at the time, and they deny that after the death of her husband, she did any act which could be regarded as an approval or ratification of this supposed agreement. They further aver, that the whole of this fund legally belonged to said Providence, and was not, in any manner, affected by the supposed agreement of May 1843, and that Thomas McCubbin, the executor of the last will of said Providence, is the party entitled to receive the same, to be by him distributed according to the terms of said will.

Testimony was then taken on both sides, the purport of which sufficiently appears from the following opinion of the court below, (KREBS, J.) delivered upon passing the decree appealed from:

"The defendants, claiming under the second will of Providence Woollen, filed in this case, claim the fund in controversy as a part of her personal estate, having been settled, as they allege upon her by her husband, in his life time, as her sole and separate estate. It is a fund on deposit in the Savings Bank of Baltimore, in the name of "Edward Patterson *for Mrs. Providence Woolen.*" This fact, unexplained, might furnish some ground for this claim. But the evidence shows clearly, I think, that this fund accrued exclusively from the wages of her husband, Wm. Woolen, earned in the employment of Messrs. J. W. & E. Patterson. It having been his money before it was deposited, those who claim it as her separate property, must show something more than the mere deposit in the above form, to establish the claim. They must show that it was so deposited with his assent, or in pursuance of his order and direction, for the purpose of thus making it her separate property. The circumstances under which it became deposited in the Savings Bank, are fully explained

by Mr. Joseph W. Patterson, one of the witnesses. He states that Mr. Woolen having been in the employment of the above firm, was discharged from their service in consequence of intemperate habits, and that they consented to re-employ him, *on condition* that he would abstain from drink, 'and to *gnarantee that*, and as a *provision for his family*, he would *allow his wife to draw his wages;* this *condition* was *made* by *witness*, that his *wife should draw his wages, to be used in the support of himself and wife and children.*' This witness also proves, that after this arrangement, 'his wages were paid *on the above condition;*' that 'the hands were settled with every six months; after, or at the time of each settlement, Mrs. Woolen would bring to Baltimore a certificate of the balance due her husband and children, (*having drawn* in the *meantime part* of the *wages*, to *support* the *family*,) *which balance* was *placed in the Savings Bank*, in the name of *Edward Patterson, for Mrs. Providence Woolen.*'

"I am clearly of opinion, that the condition and arrangement under which, by the agreement of Mr. Woolen, his wife was permitted to draw these wages, gave her no right to claim the money that accrued therefrom, as her separate property; that there was no agreement on his part that she should have it as such; but only that she should use it in the support of himself, his wife and children, and preserve it from being squandered by him in the indulgence of his unfortunate habits. The deposit in the Bank in the form in which it was made, was no part of the condition under which it was agreed that she should receive these wages; but it appears to have resulted from the circumstance, that a considerable surplus was left after the application of these moneys to the purposes specially contemplated. Nor does it appear that he directed, or ever knew, the form in which the deposit was made. I am of opinion, therefore, that there was nothing in the terms of this arrangement as originally made, or in the circumstances of the deposit, that gave to Mrs. Woolen any such right in this property as that she could dispose of it by last will and testament, or otherwise. This was a family arrangement, prompted by the humane feelings of the Messrs.

Patterson, and having in view the most praiseworthy pur-
poses, and one of those arrangements which a court of equity
will aid in carrying into execution, so far as it can be done.
It undoubtedly contemplated that these parties should con-
tinue to live together as man and wife, and no doubt the
benefits to enure from it to the wife would have been for-
feited by her if she had deserted her husband, or separated
from him without justifiable cause. A separation, however,
did in fact take place. In consequence thereof, and of a con-
troversy between these parties in regard to this fund, the
agreement of May 23rd, 1843, filed with the proceedings,
was entered into between them. This instrument I must re-
gard as binding upon the husband, whatever doubts may be
entertained in regard to its effect upon the rights of his wife.
As she had, according to the view that I have taken of her
rights, no interest in the fund, except what arose from her
title to enjoy it, in common with her husband and their chil-
dren, as originally provided for, there could be no serious ob-
jection to the provisions of that writing, unless they varied
substantially the terms of the arrangement, so as to render
them less favorable for her. It does not appear clearly that
they have any such effect.

"The agreement adopts the principle of the original ar-
rangement, substituting in lieu of the application of the
money arising from the wages, by the wife, to the support of
her husband, herself, and their children, the payment of
specific sums out of it, to them severally during their joint
lives, and of a larger sum to the survivor, and of the balance
to their children. Conceding that it is doubtful, whether this
instrument of writing, so bound this married woman, as to
have precluded her from insisting, upon the death of her
husband, that what then remained of this fund, should be
regarded as a part of his personal estate, in which she was
entitled to her distributive share, yet inasmuch as she did not
then take that ground and claim to have it divided between
herself and his personal representatives, in which event they
would have had the immediate enjoyment of their respective

shares, but preferred, her disability being then entirely re-
moved, to receive annually the sum specified in the agree-
ment to be paid to her, up to the time of her death, as the
evidence shows she did, she must in my opinion, be regarded,
in equity, as having waived any supposed rights she might
have had as distributee of her husband's personal estate, and
as having adopted, as between herself and the distributees,
the terms of this written agreement, and as having agreed to
be bound thereby.   She seems to have preferred the chances
of what she might have received during her life time, in
these annual payments, to any absolute share of the fund.
And it would not be just, after she had selected this alterna-
tive, which might have deferred the enjoyment of their
shares, by the husband's personal representatives, to a very
distant day, to permit those who represent her, now that her
life has terminated sooner than might have been expected, to
insist that she had rights as a distributee of this fund, in the
character of the widow of the deceased, for this is the most
favorable view that could be taken of her rights in reference
thereto, being satisfied as I am, that she had no claim to it,
as her separate estate.   I am of opinion, therefore, that this
fund belongs to the children of William Woolen, and Provi-
dence his wife, the parties referred to in the 4th article of the
said instrument of writing."

A decree was then passed, directing the fund in court to be
paid to the children and representatives of ·deceased children,
of William and Providence Woolen, and from this decree
McCubbin and wife appealed.

The cause was argued before LE GRAND, C. J., TUCK
and BARTOL, J.

*Coleman Yellott,* for the appellants, argued:

1st.  That the funds deposited in the Savings Bank, in the
name of "Edward Patterson, for Mrs. Providence Woollen,"
and the accrued interest and dividends, were the separate
estate of Mrs. Woollen, on the 23rd of May 1843, and

William Woollen had, at that time, no legal or equitable title thereto, or interest therein; for 1st, even if it was a mere *gift*, the husband and his personal representatives were bound thereby, and it could be impeached only by his creditors. *Clancy on Husband & wife*, 259, 260. 2 *Story's Eq.*, sec. 1380. 4 *Mason*, 443, *Picquet vs. Swan.* 6 *Cush.*, 20, *Fisk vs. Cushman.* 2 *Kent*, 162. 2 *Md. Ch. Dec.*, 353, *George vs. Spencer;* 2nd, it was not a *mere* gift, but the transfer of the husband's wages to the wife, was for a *consideration* received by him. That consideration was, 1st, employment by the Pattersons; 2nd, the labor and earnings of Mrs. Woollen, they being bestowed in the support of *his* family and *himself;* in order that his earnings might be saved for *her* benefit; 3rd, the removal of all temptation to dissipation, by placing the money *entirely beyond his control,* which could be done only by vesting it *absolutely* and exclusively in her. 1 *Md. Ch. Dec.*, 523, *Brooks vs. Dent.* 6 *Md. Rep.*, 430, *Bowie vs. Stonestreet.* 9 *Md. Rep.*, 480, *Stockett vs. Holliday & wife.* 3rd. Not merely the actual deposits, but the *interest* and *dividends* accrued thereon, were the separate property of the wife in May 1843. 2 *Roper on Husband & Wife*, 140. 4 *Mason*, 444, 454, 455.

2nd. The written agreement, of the 23rd of May 1843, could not operate to impair Mrs. Woollen's right to this fund, or to give the children of Mr. and Mrs. Woollen any legal or equitable claim thereto after her death. To have such operation this paper must be regarded either as a *contract* or a *will.* If regarded as a *contract*, it was void as to *her*, for, 1st, the general rule is that all contracts by a *feme covert* are void. 8 *Gill*, 139, *Smith vs. Morgan.* 2 *Bright on Husband & Wife*, 37, 38. 2nd. All contracts between husband and wife are void as to *her*, though they may be binding upon him. 3rd. Contracts between husband and wife for *his* benefit are not binding upon her unless made voluntarily. Here the evidence shows that she *claimed* the whole fund; and that there was a *dispute* between them about it. The paper shows upon its face that it was not executed voluntarily by the wife, but through solicitation and importunity on the part

of the husband. 2 *H. & G.*, 40, *Lowry vs. Tiernan. Clancy on Husband & Wife, Book 5, ch. 8.* 4th. A *feme covert* cannot during coverture dispose of her separate estate except in the very mode pointed out in the deed or other paper creating the trust. 4 *Md. Ch. Dec.*, 417, *Williams vs. Donaldson.* 5 *Md. Rep.*, 220, *Miller vs. Williamson.* 11 *Md. Rep.*, 492, *Cooke vs. Husbands.* 5th. If this was virtually a contract for separation between husband and wife, then it was one against *public policy* and void as to her, and equity will refuse to enforce it. 9 *Md. Rep.*, 310, *Lippy vs. Masonheimer.* 6th. It was void because not signed by Mrs. Woollen, but by a gentleman professing to act as *her attorney*, and a *feme covert* cannot act by attorney, and the courts will not aid a defective execution of a power by a *feme covert*. 6 *H. & J.*, 490, *Wallingsford vs. Wallingsford.* 1 *Bright on Husband & Wife*, 30, 31. 7th. It was void as a contract because without any valuable consideration received by *her*. The *whole* fund belonged to her. She gave away nearly all and received nothing in return. 8th. As a contract it was merely executory, because *no change of investment.* The fund still standing in the name of Patterson for the use of the wife, so far as the husband was concerned, could not be claimed by his executor or administrator, for the wife's *choses in action* not reduced into possession, survive to her and pass to her executor or administrator. *Act of* 1798, *ch.* 101, *sub-ch.* 5, *sec.* 8. 1 *Roper on Husband & Wife*, 208, 212. *Clancy on Husband & Wife*, 119, 120. 1 *Bright on Husband & Wife*, 48, 50, 51. 11 *Md. Rep.*, 512, *Bond vs. Conway.* 13 *Md. Rep.*, 361, *Chew vs. Beall.* 9th. There could be no claim by the children mentioned in the fourth clause of this paper, because this supposed contract was one to which they were *not parties*, made by a *feme covert, without consideration*, and *not even signed* by her. 10th. This paper was *void abinitio*, and no subsequent ratification, implied or express, could give effect to such a paper as a *contract* if there was no *consideration* received by Mrs. Woollen for such ratification after her husband's death as there was not. 2 *Roper on Husband & Wife*, 96. 11th. There was

no ratification of the paper after the death of the husband. 12th. The paper could pass no rights to the children mentioned in the fourth clause, because *not recorded* as required by law. If regarded as a *will*, the paper could pass no title to the children therein mentioned. 1st. Because Mrs. Woollen had, at the time, no power to make a will, and there was no republication after her husband's death. 2nd. Because all wills are revocable at pleasure, and this was actually revoked by two wills made by Mrs. Woollen after her husband's death. For these reasons the case must be decided as if this paper had never been executed.

3rd. If William Woollen had any right, legal or equitable, to this fund, before or after the 23rd of May 1843, then Mrs. Woollen, as his *widow* surviving him, was entitled to her one-third part thereof, and she never having expressly released or assigned this claim, McCubbin, as her executor, was entitled to demand and receive such portion of the fund. *Act of* 1798, *ch.* 101, *sub-ch.* 11, *sec.* 2.

*Reverdy Johnson, Jr.,* for the appellees, argued:

1st. That the whole controversy turns upon the original agreement of Woollen with his employers in 1820, and that, as shown by the evidence, was, that the wages whether paid into the hands of the wife for the immediate use of the family, or reserved to be deposited by Mr. Patterson in the wife's name, so as to place them beyond the reach of Woollen, were to be a fund for the support and maintenance of himself, wife and children. This gave her no power of disposition over the fund beyond applying the sums received to the purposes of the family, and consequently, there being nothing in the terms of the original agreement, or in the form of the deposit in the Savings Bank, as explained by the proof of that agreement, which would vest in Mrs. Woollen any separate property or powers over the fund, it cannot be affected by any will or other disposition she might make.

2nd. There is no evidence of any separate means or personal earnings of Mrs. Woollen's being commingled with the sum on deposit in the Savings Bank of Baltimore. Nor is

there any evidence of any such earnings by her beyond what she saved as a surplus over the family wants, from the sums from time to time paid her by Mr. Patterson, and which she had kept separate on deposit in the Howard Savings Bank. That sum she doubtless contemplated when executing her wills.

3rd. If we have reference to the agreement of May 1843, even conceding Mrs. Woollen's inability, by reason of coverture at that time, to appoint an agent or attorney, yet that paper embraces substantially the original arrangement; is just, fair and reasonable; and as Mrs. Woollen enjoyed its benefits during their joint lives, and survived her husband several years, without repudiating that settlement and electing to claim whatever right the law would give her against her husband's estate, but, on the contrary, acted upon the arrangement to the day of her death, her representatives must be regarded in equity as concluded from denying the validity of the agreement of 1843, which vests this fund in the children, the appellees. 2 *Ves., Sen.,* 663, *Pawlet vs. Delaval.* 2 *Story's Eq.,* secs. 1097, 1372. 2 *Sch. & Lef.,* 444, *Birmingham vs. Kirwan.* 2 *Gill,* 181, *McElfresh vs. Schley.*

*By the Court:*—We concur in the views taken of this case by the Judge of the Circuit Court, and, for the reasons assigned in the opinion delivered by him, the decree will be affirmed.

*Decree affirmed.*

(Decided June 20th, 1860.)